UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
 DANIELLE OLSEN,

                            Plaintiff,

              -against-                                    **ORDER**
                                                           21-CV-5464 (ARL)

SOUTH HUNTINGTON UNION FREE SCHOOL
DISTRICT, SHEILA BUSHE *in her individual capacity,*

                            Defendants.
-----------------------------------------------------------------X
**LINDSAY, Magistrate Judge:**

    Before the Court is the motion of the defendants, the South Huntington Union Free

School District and Sheila Bushe, for summary judgment pursuant to Federal Rule of Civil

Procedure ("Rule") 56.  For the reasons set forth below, the defendants' motion is granted.

                            **BACKGROUND**

**A.    Factual Background**

    The following facts are drawn from the parties' Local Rule 56.1 Statements and are

uncontested unless otherwise noted.

**1.    The Parties**

    The plaintiff, Danielle Olsen ("Olsen"), is an individual residing in Suffolk County, who

suffers from several mental health disabilities, including depression, anxiety, post-traumatic

stress disorder and bipolar disorder.  Defs.' Rule 56.1 Stmt. ¶¶ 1, 2.  Olsen worked as a food

service worker for the defendant, South Huntington Union Free School District (the "District"),

off-and-on during the 2016-17, 2017-18, 2018-19, and 2019-20 school years.  *Id*. ¶ 3.  The

District is a public school district located in Huntington Station, New York.  *Id*. ¶ 4.  It is

comprised of two primary schools, two intermediate schools, one sixth-grade school, one middle

school, and one high school.  *Id*. ¶ 5.  Olsen primarily worked at the District's Birchwood

Intermediate School ("Birchwood"), which houses third to fifth grade students.  *Id*. ¶ 6.  During

the relevant time period, the defendant, Sheila Bushe ("Bushe"), served as the District's School

Nutrition Director and Purchasing Agent.  *Id*. ¶ 7.  Bushe first received her civil service

certification as a purchasing agent in 2006 and began working for the District as a purchasing

agent around that time.  *Id*. ¶ 37.  Bushe then received her civil service certification as a nutrition

manager and began serving as the District's School Nutrition Manager in September 2016.  *Id*. ¶

38.

### 2.    Olsen's Personal Background

Olsen has been a South Huntington resident her entire life.  *Id*. ¶ 10.  She attended the

District's High School and graduated in 1997.  *Id*. ¶ 11.  After graduating from high school,

Olsen worked as a dog groomer until she had her first child, at which point she was a

homemaker for several years.  *Id*. ¶ 12.  Olsen also worked as a babysitter in 2015.  *Id*. ¶ 13.

The record before the Court contains varied accounts of Olsen's mental health history.

At her pre-lawsuit § 50-h examination in June 2021, Olsen testified that she has been receiving

treatment for depression since she was 16 years old.  *Id*. ¶ 14.  She also states that she has had

trouble with depression, anxiety, and bipolar disorder since 2000.  *Id*. ¶ 15.  At her deposition in

January 2023, Olsen testified that she was diagnosed with bipolar disorder in 2018 after her first

suicide attempt.  *Id*. ¶ 16.  She also averred that she had been diagnosed as having borderline

personality disorder, major depressive disorder, anxiety disorder with suicidal ideations, self-

harming disorder, panic disorder, and obsessive compulsive disorder.  *Id*. ¶ 17.   In addition,

Olsen has indicated that she was diagnosed with paranoia in 2018.  *Id*. ¶ 18.  Notably, at her

deposition in this case, Olsen testified that she was diagnosed with post-traumatic stress disorder

around December 2020, contradicting the allegation in her complaint in which she alleged suffering from that disorder for the previous 20 or so years. *Id*. ¶ 19.

In February 2020, Olsen underwent 11 rounds of electroconvulsive therapy ("ECT"). *Id*. ¶ 20. ECT is a treatment that sends an electric current to one's brain and causes a seizure. *Id*. ¶ 21. It is used to treat conditions like depression that do not get better after medicines or other therapies have been tried. *Id*. ¶ 22. However, ECT can cause memory problems. *Id*. ¶ 22. The degree of memory loss is often related to the number and type of treatment given. *Id*. ¶ 23. For example, a smaller number of treatments is likely to produce less memory difficulty than a larger number of treatments. *Id*. Permanent gaps in memories may also result from ECT and patients may also experience difficulty remembering new information. *Id*. ¶ 25. To this end, Olsen contends that her short-term memory is "really bad." *Id*. ¶ 26. By way of example, Olsen claims that she is unable to remember movies that she has seen with her kids or that she owns a car. *Id*. ¶ 27.

### 3.     The District's Food Service Workers

As noted above, Olsen worked as a food service worker for the District.[1] *Id*. ¶ 3. The District employs food service workers at each of its seven schools. *Id.* ¶ 28. The job duties of food service workers include setting up the school cafeterias for lunch and breakfast, serving student meals, and cleaning up. *Id*. ¶ 29. There are eight kitchens in the District; two at the High School and one at each other school. *Id*. ¶ 31. Food service worker positions are non-salaried, non-tenured positions with annual appointments. *Id*. ¶ 32. Food service workers generally work during the hours of the school day but are sometimes given the opportunity to work additional hours during events such as District conferences and school dances. *Id*. ¶¶ 33, 34.

---

[1] Food service workers are also referred to as nutrition staff members. Defs.' Rule 56.1 Stmt. ¶ 30.
.

In her role as the District's Nutrition Manager, Bushe oversees the eight District kitchens. *Id*. ¶ 38.  According to Bushe, she does not visit the District kitchens on a daily or weekly basis, but generally sees each kitchen at least once every two months.  *Id*. ¶ 39.  Bushe otherwise works in her office located in the District's administrative building at 60 Weston Street, Huntington Station, when she is not visiting District schools.  *Id*. ¶¶ 40, 41.  As a result, Bushe has limited interactions with the District's food service workers on a day-to-day basis.  *Id*. ¶ 42.  Indeed, Bushe stated in her affidavit that the lead chefs run the District kitchens in each building. Kleinberg Decl. Ex. E ¶ 4.

Olsen acknowledged that she would only interact with Bushe if there was a meeting for District food service workers and Bushe "never" observed her.  Defs.' Rule 56.1 Stmt. ¶¶ 44, 47. In fact, Olsen estimated that she and Bushe had about three meetings while she was employed by the District.  *Id*. ¶ 45.  Bushe generally conducts these staff meetings at the end of every summer before the start of a new school year.  *Id*. ¶ 46.  Bushe also interviews applicants for food service worker positions with the District and recommends the hiring of the District's food service workers to the District's personnel office.  *Id*. ¶¶ 48, 49.  Bushe also may but has not recommended a single food service worker's termination since serving as the District's School Nutrition Manager.  *Id*. ¶ 50.  In any case, the defendants contend that the ultimate hiring and firing authority for District food service workers lies exclusively with the District's Board of Education (the "Board").  *Id*. ¶ 51.

### 4.     The 2016-17 School Year

4

Olsen first applied for a food service worker position with the District in February 2017. *Id*. ¶ 52.  Bushe interviewed Olsen for the position.  *Id*. ¶ 53.  Olsen had been diagnosed with a mental health condition at the time but does not remember telling Bushe about it.  *Id*. ¶ 54.  In fact, according to the defendants, Bushe never learned what specific mental health disabilities Olsen claimed to suffer from although, at some point, she did learn that Olsen had attempted suicide in May 2018 and had been hospitalized for a similar reason in February 2020.  *Id*. ¶ 55; Pl.'s Rule 56.1 CounterStmt. ¶ 55.  In any case, Olsen denied having any history of mental disease when completing her medical information form for the District in February 2017, one month before she was hired.  Defs.' Rule 56.1 Stmt. ¶ 56.

In March 2017, Olsen was hired as a substitute food service worker and worked 3.9 hours a day at Birchwood.  *Id*. ¶ 58.  At the time, she reported directly to Nancy Grodner ("Grodner"), the lead chef at Birchwood, who Olsen attested was her supervisor. *Id*. ¶¶ 59, 60.  On June 5, 2017, Grodner completed a performance evaluation for Olsen for the 2016-17 school year, which both Olsen and Bushe signed.  *Id*. ¶ 62.  The 2016-17 evaluation contained thirteen total marks. Kleinberg Decl. Ex. PP.  Of the thirteen marks, six marks were "satisfactory" and seven marks were "needs improvement." *Id*.  In the comment section, Grodner noted that Olsen "need[s] to pick up speed," "has to be told what to do," and "needs to learn more about the kitchen." Defs.' Rule 56.1 Stmt. ¶ 64.  Nonetheless, the Board reappointed Olsen as a food service worker for the 2017-18 school year.  *Id*. ¶ 65.

### 5.    The 2017-18 School Year

Olsen received a second performance evaluation from Grodner in November 2017.  *Id*. ¶ 66.  Once again, the November 2017 evaluation included thirteen total marks.  Pl.'s 56.1 CounterStmt. ¶ 66.  Of the thirteen marks, five marks were "satisfactory," six marks were "needs

improvement," and two marks were "unsatisfactory." Kleinberg Decl. Ex. PP.  Grodner again checked off several areas where Olsen needed to improve, and commented that "Danielle is very respectful" but "lacks the ability to take initiative in the kitchen and continuously requires direction" and "it appears she is unable to adjust nor has she been capable of adapting to a kitchen routine." Defs.' Rule 56.1 Stmt. ¶ 67.  Olsen did not take issue with the November evaluation form and agreed that there were several areas where she could improve.  *Id*. ¶ 68.  Olsen also completed her probationary period in November 2017 and was advised that she would be appointed to a permanent food service worker position at Birchwood.  *Id*. ¶ 69.  Her hours were then increased to 5.5 hours a day.  *Id*. ¶ 70.

According to Olsen, four months later, in or around March 8, 2018, she attempted suicide and spent several weeks in the hospital.  *Id*. ¶¶ 71, 74, 81.  She avers that it was the first time she had ever attempted suicide.  *Id*. ¶ 72.  She was living at her mother's house at this time.  *Id*. ¶ 73.  After hearing from Olsen, the District granted Olsen retroactive sick leave as of March 8, 2018.  *Id*. ¶ 75.  However, Olsen's medical records from the Family Service League indicated that Olsen actually attempted suicide on April 17, 2018, not March 8, when she ingested 30-40 ten milligram pills of her son's prescribed Prozac.  *Id*. ¶ 76.  The Family Service League records also indicated that Olsen reported to staff at Northwell's Huntington Hospital that she planned to attempt suicide in March 2018 but stopped herself from acting on it.  *Id*. ¶ 77.

Nonetheless, Olsen did not work at the District from February 27, 2018 through the remainder of the 2017-18 school year, aside from one day on March 7, 2018.  *Id*. ¶ 78.  At her deposition, Olsen attested that before she attempted suicide her anxiety was picking up, and that being at work was stressful.  *Id*. ¶ 79.  But at her § 50-h examination, Olsen attested that she was

not depressed with work and was dating an abusive boyfriend at the time which was part of the reason she attempted suicide. *Id*. ¶ 80.

Olsen also testified at her § 50-h examination that she had spoken "several times" with former District employee Leanne Bedell ("Bedell') in the Personnel Department to inform her that she was hospitalized for a suicide attempt while in the hospital. *Id.* ¶ 82. Olsen testified that she did not tell Bedell that she was diagnosed with depression, anxiety and/or bipolar disorder but did tell Bedell and Bushe at some point that she had mental illness. *Id*. ¶ 83; Pl.'s Rule 56.1 CounterStmt. ¶ 83. During her deposition, Olsen also testified that she spoke with a District employee named "Lorraine" during this time but did not speak with Bushe while in the hospital. Defs.' Rule 56.1 Stmt. ¶¶ 84, 85.

In May 2018, after she was released from the hospital, Olsen went to the District office without an appointment to meet with Bushe. *Id.* ¶ 86. Olsen told Bushe that she wanted to "get [her] medication right" and that she wanted to take a leave of absence for the rest of the school year. *Id.* ¶ 87. Olsen also testified at her deposition that she told Bushe that "she was depressed and tried to commit suicide." *Id.* ¶ 89. Bushe avers that prior to the May meeting she was unaware that Olsen had attempted suicide. Kleinberg Decl. Ex. D at 35. Olsen "swears" that Bushe already knew of her suicide attempt because Bedell told her and Bushe had hugged her and said, "I'm sorry for everything you are going through." Luke Decl. Ex. F ¶ 13-15.

In any case, the District Board approved Olsen's request for sick leave on May 16, 2018, which was effective retroactively from March 8, 2018 through September 4, 2018. Defs.' Rule 56.1 Stmt. ¶ 90. Although she was on leave, an annual evaluation was completed for Olsen on May 25, 2018. Kleinberg Decl. Ex. PP. Similar to prior evaluations, the May evaluation included ten total marks. *Id.* Of the ten marks, three were "developing/needs improvement,"

five were "meets expectations," and one was "exceeds expectations." *Id.*  In June 2018, following the completion of the annual evaluation, the District wrote to Olsen to advise her that it would continue to employ her for the 2018-2019 school year.  Defs.' Rule 56.1 Stmt. ¶ 92. Olsen indicated that she would return to work for the following school year.  *Id.* ¶ 93.

6.      **The 2018-19 School Year**

However, on July 9, 2018, Olsen attempted suicide for a second time.  *Id.* ¶ 94.  Olsen claims the catalyst for the second attempt was again due in part to her then-boyfriend who was abusive.  *Id.* ¶ 95.  Olsen attests that while she was in the hospital, she called the District office and spoke to Andrea Vasquez-Madrid ("Vasquez-Madrid"), a Senior Account Clerk who reports to Bushe, and informed Vasquez-Madrid that she was again hospitalized for attempting suicide. *Id.* ¶¶ 96, 97.  She did not speak with Bushe or Grodner while in the hospital.  *Id.* ¶ 98.

Olsen requested and received another leave of absence for the start of the 2018-19 school year.  *Id.* ¶ 99.  Olsen's leave began on August 29, 2018, and she indicated an expected return date of November 1, 2018.  *Id.* ¶ 100.

On October 4, 2018, Olsen moved into 51 East 9th Street in Huntington Station, after being released from the hospital.  *Id.* ¶ 101.  Olsen's residence was run by an entity called Options for Community Living Inc. ("Options").  *Id.* ¶ 102.  Options provides housing for people with mental health and substance abuse issues.  *Id.* ¶ 103.  Options assigns its clients to staff members to ensure they receive various types of care.  *Id.* ¶ 104.  The staff members assigned to Olsen had several different job titles—including case managers, care coordinators, case workers, and house managers—and would interact with Olsen on a recurring basis.  *Id.* ¶ 105.  Olsen interacted with her case managers weekly.  *Id.* ¶ 106.  One of Olsen's case managers was Nikita

Nicholson ("Nicholson").  *Id*. ¶ 107.  Nicholson worked with Olsen on a full-time basis from 2018 to some point in 2020.  *Id*. ¶ 108.

Approximately two weeks later, Olsen returned to work.  *Id*. ¶ 109.  Olsen did not speak with Grodner nor Bushe before she returned but did call Vasquez-Madrid to inform her that she was ready to return.  *Id*. ¶¶ 110, 111.  When Olsen returned, she told some of her co-workers, including Grodner, about her recent suicide attempts.  *Id*. ¶ 112.  Olsen worked the rest of the 2018-19 school year without taking any extended leaves of absence.  *Id*. ¶ 113.  She received her most positive evaluation from Grodner for the 2018-19 school year; however, Grodner did note that "she would like to see Danielle come to work with a consistent positive attitude and be able to complete tasks in a more timely fashion."  *Id*. ¶ 114.

Then, near the end of the school year, in June 2019, Olsen worked at an 8th grade dance for Birchwood.  *Id*. ¶ 115.  Several food service workers worked the event, including Grodner and Vasquez-Madrid.  *Id*. ¶¶ 116, 117.  That evening, several staff members, including the school nurse and Grodner, reported to Vasquez-Madrid that Olsen appeared to be "out of it" and "severely medicated."  *Id*. ¶ 118.  Vasquez-Madrid was extremely concerned and drove Olsen home that night.  Kleinberg Decl. Ex. H ¶ 2.  Olsen thinks the reason that Vasquez-Madrid drove her home from the event was because she did not have a car at that time.  Defs.' Rule 56.1 Stmt. ¶ 120.

### 7.     The 2019-20 School Year

Despite the event at the dance, the District reappointed Olsen to her position at Birchwood for the 2019-20 school year.  *Id*. ¶ 121.   In September, Olsen completed another

medical information form.  *Id*. ¶ 122.  This time, Olsen indicated that she was suffering from a "mental disease" and that she had been seeing a psychiatrist and therapist.[2]  *Id.*

In the fall, Olsen was in a car accident.  *Id*. ¶ 124.  It appears that she hit the back of a garbage truck, but then continued driving to work.  *Id*. ¶ 125.  After the accident, Olsen called Grodner.  *Id*. ¶ 126.  Grodner then called Vasquez-Madrid, concerned about Olsen, and asked if she could go to Birchwood to check in on her.  *Id*. ¶ 127.  Vasquez-Madrid drove to Birchwood and spoke with Olsen in the cafeteria that morning.  *Id*. ¶ 128.  Vasquez-Madrid told Olsen to take the rest of the day off.  *Id*. ¶ 130.

In early January 2020, Grodner then called Bushe to express concern for Olsen.  *Id*. ¶ 131.  According to Bushe, Grodner relayed that she saw Olsen in the Birchwood kitchen "rocking back and forth" despondently while holding a sharp knife in her hand.  Kleinberg Decl. Ex. E ¶ 7.  Olsen claims that at no point during her employment did she hold a sharp knife while rocking back and forth in the Birchwood kitchen.  Luke Decl. Ex. F ¶ 66.  Nevertheless, during the same conversation, Bushe says Grodner relayed that Olsen had advised she was having trouble adjusting to new medication.  Kleinberg Decl. Ex. E ¶ 7.  Olsen claims that she did not tell anyone that she was on new medication in January 2020, but admitted the medication made her feel like "[she] was not really [herself]" around that time.  Defs.' Rule 56.1 Stmt. ¶ 142. As a result, Bushe drove to Birchwood to speak with Olsen, who she says was having difficulty verbalizing what happened or how she was feeling.  *Id*. ¶ 134.  Bushe then drove Olsen home to her mother's house that same day.  *Id*. ¶ 135.  Olsen does not recall ever being driven home by Bushe.  *Id*. ¶ 137.  Olsen only recalls that in January 2020, Grodner told her that she had concerns about her and noticed something was wrong.  *Id*. ¶ 139.

---

[2] Buhse never saw the 2019 medical evaluation form prior to this litigation.  Defs.' Rule 56.1 Stmt. ¶ 123.

Olsen took six days of sick leave from January 7, 2020 to January 14, 2020. *Id*. ¶ 140. On January 7, 2020, the first day of her leave, Vasquez-Madrid texted Olsen to tell her that she would need a doctor's note indicating she was "able to return to full-duty" to return to work. *Id*. ¶ 141. Olsen does not recall missing work at that time but relayed that she "could have" missed it "because [she] was not really [herself]." *Id*. ¶ 143.

According to the defendants, Olsen returned to work on January 15, 2020, and with the exception of January 28, 2020, worked until February 7, 2020, when she was hospitalized for suicidal ideations. *Id.* ¶ 144-46. At her § 50-h examination, Olsen indicated that she did not remember whether she actually attempted suicide at that time, "but did not think her doctor would have let her attempt it in his office." *Id.* ¶ 147. Olsen was also experiencing visual hallucinations on a daily basis at that time. *Id*. ¶ 148. Olsen believes she may have started experiencing the hallucinations at the beginning of 2020. *Id*. ¶ 149. She claims she would see a shadow approaching her, but then would realize no one was there. *Id*. ¶ 150.

At her § 50-h examination, Olsen claimed she called Vasquez-Madrid shortly after being hospitalized and told her that she was in the hospital for suicidal reasons again. *Id*. ¶ 151. In fact, Olsen claims she called Vasquez-Madrid "at least five or six times" while hospitalized. *Id*. ¶ 152. There is no indication in the record that Olsen spoke to anyone else in the District during that hospitalization. *Id*

At some point while hospitalized, Olsen was transferred to Syosset Hospital to receive electroconvulsive therapy treatment ("ECT"). *Id*. ¶ 153. Nicholson recalls Olsen informing her that her short-term memory was affected at that time. *Id*. ¶ 154. Specifically, Nicholson remembered Olsen telling her that she would forget how she got home and that she could not go out on her own. *Id*. ¶ 155. Olsen says that on or around March 27, 2020, she began to realize

11

that she had slight short term memory loss but by the summer of 2020, she was able to remember significant events and details again.  Pl.'s Rule 56.1 CounterStmt. ¶ 154.

.       On March 16, 2020, the District then converted to virtual learning due to the COVID-19 pandemic, a week-and-a-half before Olsen's release from the hospital.  *Id*. ¶ 157.  As a result, Olsen did not seek to return to work upon her March 27, 2020 release from the hospital, even though she was cleared to do so.  *Id*. ¶ 158.  Instead, Olsen applied for unemployment benefits. *Id*. ¶ 159.  To be clear, even though the District had converted to virtual learning, Bushe requested several food service workers to continue from March 2020 to June 2020 via email because the District had established a remote site to provide community members with free/ reduced cost meal plans.  *Id*. ¶¶ 160, 161.  However, Olsen did not contact anyone at the District after her release from the hospital.  *Id*. ¶ 163.  Nonetheless, the District chose not to contest Olsen's filing for unemployment.  *Id*. ¶ 164.  Bushe says that she understood that many staff members were hesitant to work in the kitchen during that time.  *Id*. ¶ 165.

### 8.       The 2020-21 School Year

In June 2020, the District wrote to Olsen to advise her of her continued employment for the 2020-21 school year.  *Id*. ¶ 166.  On July 30, 2020, Bushe then sent a letter to all school nutrition staff members informing them that a mandatory department meeting would be held on August 11, 2020, at 9 a.m. at the District administration building.  *Id*. ¶ 167.   The letter indicated that the meeting would be held at the District's administrative building on the "outside back grounds to ensure social distancing" for attendees.  *Id*. ¶ 168.  The letter further indicated that the meeting was expected to last one hour.  *Id*. ¶ 169.  Bushe provided her personal cell phone number and the District's office number on the letter.  *Id*. ¶ 170.  Olsen admits that she received

this letter from Bushe.  *Id*. ¶ 171.  She also acknowledges that she had planned to return to work for the 2020-21 school year.  *Id*. ¶ 172.

On August 10, 2020, the day before the planned meeting, Bushe decided to change the location of the meeting from the administration building to the District's Stimson Middle School because the weather forecast for August 11, 2020 was hot and humid.  *Id*. ¶¶ 173, 174.  Stimson Middle School is about a mile and a half away from the administration building.  *Id*. ¶ 175. Bushe, and other District personnel, including Vasquez-Madrid, felt it more appropriate to meet indoors where there was air conditioning, as long as social distance protocols could be followed. *Id*. ¶ 176.  It was not possible to follow social distancing protocols indoors at the administration building.  *Id*. ¶ 177.

Bushe directed Vasquez-Madrid to call all District food service workers about the meeting's location chance.  *Id*. ¶ 178.  Vasquez-Madrid spent most of the day on August 10, 2020 calling all District nutrition staff members to inform them of the location change.  *Id*. ¶ 179. Vasquez-Madrid left voicemails for those who did not answer her calls.  *Id*. ¶ 180.  Vasquez-Madrid believes she called Olsen that day, along with every other staff member.  *Id*. ¶¶ 181, 182. Olsen denies receiving a call or voicemail from anyone at the District about the location change. Pl.'s Rule 56.1 Counter Stmt. ¶¶ 181, 182.

On the morning of the meeting, August 11, 2020, Olsen's sister drove her to the administration building.  Defs.' Rule 56.1 Stmt. ¶ 183.  Olsen arrived at the administration building around 8:45 a.m.  *Id*. ¶ 185.  Olsen's sister parked her car along the sidewalk in front of the administration building and Olsen waited in the car with her sister for around a half hour.  *Id*. ¶¶ 186, 187.  Olsen claimed she waited in the car for other food service workers to arrive because she had a "lot of anxiety about being too early." *Id*. ¶ 188.  Sometime before 9:15 a.m.,

Olsen sister drove around to the "back grounds" of the building, and there was no one there.  *Id*.
¶ 189.  Around 9:15 a.m. shortly after noticing no one was there, Olsen walked into the building
and spoke with Security Officer Juan Ortiz.  *Id*. ¶ 190.  Ortiz had been advised to tell any food
service workers who mistakenly went to the administration building that the meeting had been
moved to Stimson Middle School.  *Id*. ¶ 191.  Olsen thanked Ortiz and walked back to her
sister's car but she did not drive to Stimson - she asked her sister to take her home.  *Id*. ¶¶ 192-
94.

Olsen estimated she could have arrived at Stimson sometime around 9:30 a.m. but
testified that she chose not to because of her anxiety.  *Id*. ¶ 195.  Olsen did not call/contact
anyone at the District that day after leaving the administration building.  *Id*. ¶ 196.

Bushe led the meeting at Stimson on August 11, 2020.  *Id*. ¶ 197.  The meeting addressed
the safety protocols to be implemented for the approaching 2020/21 school year.  *Id*. ¶ 198.
For example, Bushe talked about the ways serving students would change, as well as protocols
and new types of packaging for food products.  *Id*. ¶ 199.  Bushe explained to those in attendance
that the upcoming school year would be hectic due to the COVID-19 precautions that needed to
be taken.  *Id*. ¶ 200.  Bushe also advised all attendees they did not have to return to work when
the school year began if they were uncomfortable doing so.  *Id*. ¶ 201.  Most employees returned
to work as scheduled in the fall, but two employees resigned at the end of the meeting or shortly
thereafter. *Id*. ¶ 202.

The following day, on August 12, 2020, Bushe received an email from Olsen.  *Id*. ¶ 204.
Olsen informed Bushe that she went to the District Office for the meeting on August 11, 2020,
that no one was there, and that she left flustered.  *Id*. ¶ 205.  Olsen also wrote in the email that
she was unsure whether she had been fired, quit or "just disappeared." *Id*. ¶ 206.  In addition,

14

Olsen said she did not receive notification about the change in location and indicated that she figured "maybe I don't have a job." *Id*. ¶ 207.  Finally, Olsen noted that she had undergone a procedure following her suicide attempt in February 2020 which made her "lose part of her memory."  *Id*. ¶ 208.

Olsen then called Bushe later that afternoon.  *Id*. ¶ 209.  Bushe received the call in her office while Vasquez-Madrid was present.  *Id*. ¶ 210.  Olsen's case manager, Nicholson, was also on the phone call.  *Id*. ¶ 211.  Bushe attests that she tried to explain why the meeting had been moved to Stimson, and that the District attempted to notify Olsen of the change.  *Id*. ¶ 212.  Olsen denied this fact.  Pl.'s Rule 56.1 CounterStmt. ¶ 212.  Bushe also avers that she told Olsen what she told all of the staff at the meeting the preceding day; that is, that the new school year would be hectic and that if Olsen wanted to take some time off before returning to work, she could do so.  Defs.' Rule 56.1 Stmt. ¶ 213.  Bushe contends that she was aware that Olsen had experienced personal hardships for a few years preceding the call and wanted to ensure that Olsen knew that the school year would be unlike any other before due to the COVID-19 precautions.  *Id*. ¶ 215.  Again, Olsen denies that Bushe told her what had happened at the meeting, that she said that the new school year would be hectic or that she could take some time off before returning to work.  Pl.'s Rule 56.1 CounterStmt. ¶ 213.  Instead, Olsen claims that Bushe referenced the COVID-19 precautions and stated, "With the changes this year, we thought the school year would be too stressful and we don't think you could mentally handle it." Pl.'s Rule 56.1 CounterStmt. ¶ 215.   Bushe adamantly denies that she made that comment, and Vasquez-Madrid, who was in the room, also attests that she did not hear Bushe say those words. Defs.' Rule 56.1 Stmt. ¶ 217.  In fact, Bushe avers that she did not mention or allude to Olsen's mental health at any point during that phone call and only mentioned that the work year would

be stressful.  *Id.* ¶ 221.  Olsen admits that Bushe cited "the COVID changes" as the reason why

that school year would be stressful.  *Id.* ¶¶ 222-23.

Nicholson, who typed up a note summarizing the phone call two weeks later noted that

Bushe had told Olsen that it was "in her best interest to resign and take some time for herself

especially with the new restrictions and structuring for the coming school year." *Id.* ¶ 218.

Nicholson has no personal recollection of the phone call and testified at a deposition that her

notes were not written "verbatim." *Id.* ¶ 219.  Nicholson also does not recall how much of that

note was prepared on August 12, 2020 (the day of the phone call) and how much was written on

August 25, 2020 (the day the note was finalized) or any other day in between.  *Id.* ¶ 220.

In any case, Olsen contends that after she spoke to Bushe, the "District's employees"

frequently called her and asked when she could come in to sign resignation paperwork.  Luke

Decl. Ex. F ¶ 42.  She also avers that Joanne Padilla in the District's Personnel Office constantly

emailed her regarding resignation.  *Id.*  However, Olsen admits that she did not communicate

with anyone in the District after the August 12, 2020 phone call with Bushe, until she emailed

Bushe on August 26, 2020.  Defs.' Rule 56.1 Stmt. ¶ 226.  In that email. Olsen complained that

she "was not called [about the meeting change] due to [Bushe's] decision that the school year

would be too stressful for [Olsen] to mentally handle." *Id.* ¶ 227.  Olsen further insinuated that

although Bushe asked Olsen to sign resignation papers, she had "no intention" of doing so

because she "was ready and willing to resume [her] position." *Id.* ¶ 228.

On August 26, 2020, Bushe emailed Olsen and District Personnel Facilitator Joanne

Padilla and explained, once again, that the District attempted to notify Olsen of the change in the

meeting location.  *Id.* ¶ 229.  In that email, Bushe also wrote that Olsen was expected to attend

that meeting as there was "no other conversation to the contrary." *Id.* ¶ 230.  Moreover, Bushe

stated the reason she had called Olsen the following day was to "discuss the mix up of the missed meeting," which Bushe attests was "the extent of [Bushe's] communication with [Olsen]," not to discuss her resignation.  *Id*. ¶ 231.  Upon receipt of Bushe's email, Padilla then mailed a letter to Olsen, requesting that she submit a doctor's letter to return to work at the District following her extended absence.  *Id.* ¶ 232

On August 28, 2020, Olsen emailed Bushe again stating, "[a]fter what you said to me I don't feel comfortable at this time [returning to the District]." *Id*. ¶ 233.  The following day, Bushe responded by email stating: "I am unsure what you feel was said to you but my intent was one of care from one employee to another. Because we seem to be at an impasse in this conversation, it may be best for you to talk directly with personnel as we make plans for your return to work." *Id*. ¶ 234.  Again, on August 29, 2020, Padilla sent a follow-up email to Olsen informing her that when the District received a doctor's note she would be cleared to return to work.  *Id*. ¶ 235.

On August 31, 2020, Olsen emailed Padilla emphasizing once more that she was not comfortable returning to work.  *Id*. ¶ 236.  Padilla responded that day informing her that her position remained open "regardless of anything said to [her]" and reminded Olsen to submit a doctor's note indicating she was medically cleared to return.  *Id*. ¶ 237.  On September 1, 2020, Olsen responded to Padilla and wrote "I will not be returning" and "I [don't] feel comfortable after the [conversation] with Sheila." *Id*. ¶ 238.  At that point, Padilla informed Olsen that she would need to resign or it would be considered an "abandonment" of her position.  *Id*. ¶ 239.

On September 10, 2020, Padilla emailed Olsen to inquire if she had received a resignation form that she had mailed and to request that she either complete the form or submit a letter stating her decision to resign.  *Id*. ¶ 240.  On September 11, 2020, Olsen claimed she had

not received the forms.  *Id.* ¶ 241.  On September 21, 2020, Padilla asked Olsen to advise her as

to when she planned on returning union books and signing a resignation form.  *Id.* ¶ 242.  That

day, Olsen replied stating she never received the resignation form.  *Id.* ¶ 243.  Padilla responded

a few minutes later indicating she sent the form several weeks earlier and inquired as to Olsen's

correct mailing address.  *Id.* ¶ 244.  Olsen responded shortly thereafter informing Padilla that she

had the correct mailing address and that she had not received the form.  *Id.* ¶ 245.

Despite the back and forth, on October 14, 2020, Olsen signed a resignation form.  *Id*. ¶

246.  On the form, Olsen wrote that the reason for her resignation was that "[she] was told by

Sheila Bushe [that] she felt the year would be too stressful [and she] couldn't mentally handle

it." *Id.* ¶ 247.  Bushe says she was "extremely uncomfortable" when she received the form and

was required to countersign it since Olsen's claim that Bushe had said "the year would be too

stressful and she couldn't mentally handle it" was untrue.  *Id*. ¶ 248.  In fact, Bushe testified that

she had extreme reservation in signing the resignation document because "that is not what

transpire[d]." *Id*. ¶ 249.

Nevertheless, Bushe states that she decided to sign the document because the Birchwood

kitchen was left short-staffed while Olsen refused to return to work at the start of the 2020-21

school year.  *Id*. ¶ 250.  To fill Olsen's position at Birchwood, Olsen needed to resign to

"unencumber" the position for the Board of Education and thus allow someone else to work

there.  *Id*. ¶ 251.  Bushe, nonetheless, drafted a "memorandum to file" dated October 2020 to

"put [her] thoughts down" regarding Olsen's resignation.  *Id*. ¶¶ 252-53.  Bushe memorialized

her memory of the August 2020 events—including the August 11th meeting, the August 12th

phone call with Olsen, and the ensuing email correspondence.  *Id*. ¶ 254.  Bushe made clear in

the memorandum, that she did not make the comment that "[Bushe] felt the year would be too stressful and [Olsen] could not mentally handle it." *Id*. ¶ 255.

The Board accepted Olsen's resignation on October 29, 2020. *Id*. ¶ 256. Olsen has not worked anywhere since leaving the District and claims to be unable to do so since the "incident" with Bushe. *Id*. ¶ 257.

### B.   Procedural History

On March 22, 2021, Olsen filed a complaint with the Equal Employment Opportunity Commission ("EEOC") against the District. Compl. ¶ 5. On March 22, 2021, Olsen served the District with a Notice of Claim. *Id.* ¶ 6. On March 29, 2021, Olsen filed an Order to Show Cause in Suffolk County Supreme Court seeking leave to serve and file a late notice of claim against the District. *Id*. ¶ 7. On May 26, 2021, the District consented to be served with a late Notice of Claim. *Id*. ¶ 8. On June 15, 2021, the District conducted a 50-h hearing pursuant to the Notice of Claim. *Id*. ¶ 9. On August 10, 2021, the EEOC mailed a Right to Sue Letter to Olsen.

On October 1, 2021, Olsen commenced the instant action pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA"), and the New York State Human Rights Law, New York State Executive Law § 296, et seq. ("NYSHRL"), against the District and Bushe in her individual capacity. On February 6, 2023, the parties filed a consent to have the undersigned conduct all proceedings in this case including the entry of a final judgment. On September 14, 2023, the defendants filed the instant motion for summary judgment.

## DISCUSSION

### A.      Standards of Law

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Puglisi v. Town of Hempstead*, No. 10 CV 1928, 2012 WL 4172010, *6 (E.D.N.Y. Sept. 17, 2012) (quoting *In re Blackwood Assocs., L.L.P.,* 153 F.3d 61, 67 (2d Cir. 1998) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c)).  In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc*., 150 F.3d 132, 137 (2d Cir. 1998).  If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable.  *See Holt v. KMI-Continental, Inc*., 95 F.3d 123, 129 (2d Cir. 1996), *cert denied*, 520 U.S. 1228 (1997).

The trial court's responsibility is "limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994).  When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "[T]here must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim." *Jamaica Ash & Rubbish v. Ferguson*, 85 F. Supp. 2d 174, 180 (E.D.N.Y. demonstrating that little or no evidence may be found in support of the non-moving party's case. Accordingly, "[w]hen no rational jury could find in favor of the nonmoving party because the

evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Marks v. New York Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).

### B.    Olsen's ADA and NYSHRL Claims

The American with Disabilities Act ("ADA") was enacted by Congress to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).  A disability is defined as follows:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment. . ..

*Hernandez v. Int'l Shoppes, LLC*, 100 F. Supp. 3d 232, 250 (E.D.N.Y. 2015) (citing 42 U.S.C. § 12102(1)).  The definition of disability is broader under the NYSHRL.  *Levine v. Smithtown Cent. Sch. Dist.*, 565 F. Supp. 2d 407, 428 (E.D.N.Y. 2008).  Disability under the state statute is defined as (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques; or (b) a record of such an impairment; or (c) a condition regarded by others as such an impairment, provided, however, that in all provisions of this article dealing with employment, the term shall be limited to disabilities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held.  *Hernandez*, 100 F. Supp. 3d at 251 (citing N.Y. Exec. Law § 292 (21)).

While the definitions of disability under the ADA and the NYSHR differ slightly, claims

brought under both statutes are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)*. See Berger v. New York City Police Dep't,* 304 F. Supp. 3d 360, 367 (S.D.N.Y. 2018).  To this end, a plaintiff must first be able to establish a prima facie case of discrimination.  *DiIorio v. Cnty. of Suffolk,* No. 21-CV-01273 (JMW), 2024 WL 1908602, at *11 (E.D.N.Y. May 1, 2024) (citing *Brown v. Northrop Grumman Corp.,* No. 12-CV-1488 (JS)(GRB), 2014 WL 4175795, at *5 (E.D.N.Y. Aug. 19, 2014) (citation omitted)).  "The elements of a [prima facie discrimination] claim under the ADA are that: (1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA or perceived to be so by her employer; (3) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (4) she suffered an adverse employment action; and (5) the adverse action was imposed because of her disability." *Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 21 (2d Cir. 2015)(citing *Davis v. N.Y.C. Dep't of Educ*., 804 F.3d 231, 235 (2d Cir. 2015)).  Under the NYSHRL, a plaintiff must also "demonstrat[e] that [s]he suffered an adverse employment action under circumstances giving rise to an inference of discriminatory intent." *Id; see also Smith v. City of New York,* 385 F. Supp. 3d 323, 342 (S.D.N.Y. 2019) (a plaintiff bringing a claim under the NYCHRL must show that the conduct complained of is caused by a discriminatory motive)."  In addition, it is important to note that under the ADA, "a plaintiff alleging a claim of employment discrimination [must] prove that discrimination was the but-for cause of any adverse employment action." *Natofsky v. City of New York,* 921 F.3d 337, 348 (2d Cir. 2019).

Olsen asserts that she suffered an adverse employment action when Bushe advised her in 2020 that "[w]ith the changes this year, we thought the school year would be too stressful and we don't think you could mentally handle it." Pl.'s Mem at 5.  Olsen further asserts that Bushe then

suggested it would be in her best interests if she resigned.  *See* Luke Decl. Ex. F ¶¶ 40, 41;

Defendants' Ex. Y.  Olsen argues, therefore, that she was constructively discharged from her job

because any reasonable person in her position would have felt, as she did, compelled to resign.

The Court disagrees and finds that none of the actions of the defendants constitute an adverse

employment action.

An adverse employment action is a "materially adverse change in the terms and

conditions of employment." *Weeks v. N.Y. State (Div. of Parole),* 273 F.3d 76, 85 (2d Cir. 2001).

Examples of materially adverse employment actions include "termination of employment, a

demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of

benefits, [and] significantly diminished material responsibilities." G*alabya v. New York City Bd.

Of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000).  "A constructive discharge is 'functionally the same

as an actual termination' and therefore is considered an adverse employment action*.  Campbell v.

New York City Transit Auth.,* 93 F. Supp. 3d 148, 170 (E.D.N.Y. 2015), aff'd, 662 F. App'x 57

(2d Cir. 2016) (citing *Pa. State Police v. Suders*, 542 U.S. 129, 148, 124 S. Ct. 2342, 159 L.

Ed.2d 204 (2004)).  However, "[i]t occurs only 'when an employer intentionally creates a work

atmosphere so intolerable that [the plaintiff] is forced to quit involuntarily.'"  *Id* (citing *Borski v.

Staten Island Rapid Transit*, 413 Fed. Appx. 409, 411 (2d Cir.2011) (alteration in original)).  In

fact, "'[a] constructive discharge cannot be proven merely by evidence that an employee

preferred not to continue working for that employer' or that 'the employee's working conditions

were difficult or unpleasant.'" *Id*. (citing *Miller v. Praxair, Inc*., 408 Fed. Appx. 408, 410 (2d

Cir. 2010)).  In addition, a claim for "[c]onstructive discharge requires evidence [] that the

employer acted deliberately or intentionally in bringing about the complained of work

conditions."  *Id.* (citing *Petrosino v. Bell Atl.,* 385 F.3d 210, 229 (2d Cir. 2004)).  To this end,

something beyond mere negligence or ineffectiveness on the part of the employer is required. *Id*.

The summary judgment record in this case clearly establishes that Olsen's decision not to return to work for the 2020-21 school year was entirely voluntary. Even accepting Olsen's version of the telephone conversation between Bushe and herself that took place on August 12, 2020, it is undisputed that following that conversation, Bushe immediately responded to Olsen by email explaining that the purpose of her phone call was to discuss the mix up concerning the meeting location, not to discuss her resignation. Defs.' Rule 56.1 Stmt. ¶ 231. In fact, on August 27, 2020, after Bushe had contacted Olsen, Padilla sent Olsen a letter requesting that she submit a doctor's letter to return to work at the District given her extended absence. *Id.* ¶ 232

Nonetheless, on August 28, 2020, Olsen emailed Bushe again stating, "[a]fter what you said to me I don't feel comfortable at this time [returning to the District]." *Id*. ¶ 233. Bushe responded the following day by email stating: "I am unsure what you feel was said to you but my intent was one of care from one employee to another. Because we seem to be at an impasse in this conversation, it may be best for you to talk directly with personnel as we make plans for your return to work." *Id*. ¶ 234. Then, on August 29, 2020, Padilla emailed Olsen again informing her that as soon as the District received a doctor's note, she would be cleared to return to work. *Id.* ¶ 235. When Olsen emailed Padilla two days later emphasizing once more that she was not comfortable returning to work, Padilla informed her for a third time that her position remained open to her "regardless of anything said to [her]." *Id*. ¶ ¶ 236,237.

Despite the District's attempt to dispel Olsen of the notion that she was being asked to leave, on September 1, 2020, Olsen wrote "I will not be returning." *Id*. ¶ 238. While it may have been unpleasant for Olsen to return to work given what she believed Bushe had said to her, Olsen has not presented any evidence that would support a finding that the defendants deliberately

24

brought about the condition of which she complains.  Campbell., 93 F. Supp. 3d at 171–72

(citing *Adams v. Festival Fun Parks, LLC,* 560 F. App'x 47, 50  (2d Cir. 2014) (finding no

material question of fact as to whether the plaintiff was constructively discharged where the

employer's handling of the matter was, at most, ineffective or even incompetent)).  Because

Olsen has not shown that she was subject to an adverse employment action due to her disability,

her ADA and NYSHRL disability claims cannot succeed as a matter of law, and thus, the Court

grants the defendants' motion for summary judgment.[3]

The Clerk of the Court is directed to close this case.

Dated: Central Islip, New York        **SO ORDERED:**
        June 26, 2024

                          _____/s_____
                          ARLENE R. LINDSAY
                          United States Magistrate Judge

[3] With respect to Olsen's third cause of action as against Bushe as an aider and abettor, the ADA does not permit the imposition of liability on individuals in their individual or representative capacities. *Turowski v. Triarc Companies, Inc.*, 761 F. Supp. 2d 107, 110–11 (S.D.N.Y. 2011).  Under the NYSHRL, an individual may be held liable as an aider and abettor of discriminatory practices but only after liability is established against the employer.  *Id.*  Given the Court's ruling on the Olsen's NYSHRL claim, the claim against Bushe as an aider and abettor must also be dismissed.

25